EARN LINE S. S. CO. v. UNITED STATES.

(Circuit Court, E. D. Pennsylvania. June 12, 1909.)

No. 19.

SALVAGE (§ 28*)—RESCUE OF DERELICT—NAVAL COAL BARGE—AMOUNT OF COMPENSATION.

An award of $4,000 made against the United States for the salvage of a derelict iron coal barge belonging to the navy and worth $18,000, which was picked up off the southern coast of Florida and towed to Jacksonville by the steamship Nordkyn, worth about $100,000, then on a voyage under a time charter at a monthly hire of $4,000, which was delayed 46 hours. The barge was in the track of vessels, and would probably have been picked up by some other vessel, but, being without lights, was a menace to navigation. The sea was somewhat rough, and the service attended with some danger, and the award included $350 for the towage of the barge by a tug up the St. Johns river.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. §§ 69, 71; Dec. Dig. § 28.*]

In Admiralty. Suit against the United States for salvage.

Charles Welsh Edmunds and Francis S. Laws, for petitioner.

Walter C. Douglas, Jr., Asst. U. S. Atty., and J. Whitaker Thompson, U. S. Atty.

J. B. McPHERSON, District Judge. This is a suit under the so-called "Tucker Act" of March 3, 1887, c. 359, 24 Stat. 505 (U. S. Comp. St. 1901, p. 752), and is brought by the Earn Line Steamship

EARN LINE S. S. CO. V. UNITED STATES.

Company, charterer of the Norwegian steamship Nordkyn, to recover salvage from the United States for the rescue of a derelict coal barge belonging to the navy. In obedience to the act, I find the facts to be as follows:

The Nordkyn is a steel vessel of 2,104 tons net register, and was worth about $100,000 when the service in question was rendered. On April 6, 1907, she was under a time charter to the Earn Line Steamship Company, the monthly hire being nearly $1,000. Her crew comprised 25 officers and men, and the monthly wage account was 2,720 kroner, or about $725. Her daily coal consumption under full speed was from 20 to 22 tons. She left Baltimore on April 2d, bound south for Tampico, Mexico, with a cargo of coal. On Saturday, April 6th, between 4 and 5 o'clock in the afternoon, when she was off the southern coast of Florida about 15 miles northeast of Cape Canaveral, the barge was seen some distance away. She had broken loose from a collier that was towing her from Key West to Norfolk, and, while it does not clearly appear that she had been finally abandoned, she was at large upon the sea and was prima facie a derelict. Under a strong wind from the southwest and a high sea, she was drifting away from the land and was rolling heavily. The steamship came as near as was prudent, perhaps within half a mile, slowed down, and whistled to learn if any person was upon the barge. No response being received, the chief mate and four men were ordered to go on board. On account of the wind and high sea, there was some danger in reaching her and in climbing her ladder, but the risk was not excessive, although some water was shipped during the passage, and no injury was done except slight damage to the small boat. No one was on board, and (as has been stated) the vessel was apparently a derelict. The pumps showed about a foot of water, but the steering gear seems to have been in order, and in other respects she had seemingly suffered little injury. A new seven-inch manila hawser was found, and this was made fast to the steamship after about an hour's work, the mate and two men remaining on the barge. A new line belonging to the Nordkyn was used as a bridle, and this was afterwards broken in several places. After the hawsers were adjusted, the vessel turned about and proceeded up the coast in a northerly direction, in order to take the barge to Jacksonville. At 11 o'clock the ship and her tow arrived off Mosquito Island, and, fearing that the barge and men might be lost in the darkness, the Nordkyn came to anchor, the barge hanging on behind. The mate and men were taken off for the night. Early on Sunday morning the second mate and two men were put upon the barge, and the steamship resumed the voyage toward Jacksonville. About 8 o'clock the strain upon the hawser caused it to part, and the tow was interrupted. The work of eight men for an hour or more was necessary before the hawser was again made fast, but there was no further incident during the day that calls for notice. At 6 o'clock in the evening, the tow arrived off St. Johns river, and signaled for a pilot and a tug. While awaiting their arrival the ship came to anchor about five miles out from the mouth of the river, and at 11 o'clock that night turned over the barge to the Jacksonville Towing & Wrecking Company, under an agreement that she should be

delivered to the United States court at Jacksonville, subject to the salvage claims of the Nordkyn and the towing company. The steamship immediately resumed her voyage to Tampico, and on Monday at 2 o'clock in the afternoon was again at the point off Cape Canaveral where she first discovered the barge.

During all the time occupied by the tow the wind was heavy and the sea was high, and the steamship was obliged to run under slow or half speed for fear of parting the hawser. On both occasions when the hawser was run, and on the three occasions when men were put aboard the barge, the steamship was in some, but I think not serious, danger of collision. While the weather may probably be described as stormy, there was no alarming or very threatening danger from this source to either vessel. A close watch was maintained on the barge both by day and by night for fear she might break loose. The distance from the point where she was picked up to the point where she was delivered to the towing company's tug was 125 miles, making the distance traveled by the Nordkyn out of her course 250 miles; and the time thus consumed was 1 day and 22 hours. The towing company delivered the barge at Jacksonville, a distance of 26 miles up the St. Johns river, the service rendered after the river was reached involving nothing more than is ordinarily required of a tug on inland waters. The barge was an iron vessel, built in 1884, and had been bought by the United States during the Spanish War and converted into a coal barge for use by the navy. She was 200 feet long, 34 feet beam, 19 feet 9 inches depth of hold, and had a carrying capacity of 1,600 tons of coal. She was equipped with four modern steam winches, two modern boilers, a steam capstan and windlass, and was fitted as an ocean-going barge, although she was not well adapted for coaling purposes. After the rescue, she was brought to the Norfolk Navy Yard, where $1,350 was spent in overhauling her.

The towing company put in a claim to the government for a share in the salvage, but (so far as appears) there has been no litigation either by that company or by the Earn Line until the present suit was begun. Originally the towing company was not a party to the action, but recently it has entered an appearance, adopted the averments of the petition so far as its own services are concerned, and submitted its claim to the court.

It is conceded that both claimants rendered salvage services, and it is also conceded that the barge is to be treated as a derelict, although she may have been only temporarily abandoned. The character and extent of the services sufficiently appear from the finding of facts, and need not be dwelt upon. The work was meritorious, was performed with skill and prudence and assiduity, and involved some, although not a high degree of, hazard. It has been urged by the government that the barge was in such a position that she would surely have been picked up soon by some other vessel, if the Nordkyn had not undertaken the task; and this I think may be assumed, if no disaster had happened to the barge meanwhile. But, aside from the risk to which the barge herself was exposed in her helpless condition, it may fairly be taken into account (as an offset to the probability of rescue by some other vessel) that she was a dangerous menace to navigation,

and all the more dangerous because many other ships were likely to be in the neighborhood. She was large and heavy in bulk, without lights and without guidance, drifting with the wind and tide toward the track of coastwise vessels, and it need not be said that the sooner she was taken in charge the safer that part of the sea would be. The principal contention has been waged about the value of the barge at the time of the rescue, and a large part of the testimony has been devoted to this subject. I shall not discuss it in detail; it ranges between widely separated estimates, and I have given it careful consideration. The result is that I find the value to have been about what the government's witnesses have indicated, say, in round numbers, $18,000. I may add that the court's award would not be changed, even if her value were $25,000, for the decree is not based upon a percentage, but upon my estimate of what the services were worth. Into that estimate the value of the property saved has necessarily entered in some degree, but not so essentially that the difference between $18,000 and $25,000 would seriously affect the result.

In my opinion the Jacksonville Towing & Wrecking Company is entitled to $350. The Earn Line Steamship Company should recover the following sums:

| | |
|---|---:|
| Charter hire at rate of 815 pounds per month | $263 60 |
| Wages at 2,720 kroner.......... "    "  (say) | 50 00 |
| Coal ..........................(say) | 22 00 |
| Food ............................ " | 25 00 |
| Damage to boat................... " | 15 00 |
|     "     " line................. " | 57 50 |
| | $433 10 |

But these items are to be paid either to the owners or to the charterer, as the charter party may determine. In addition, an award is made of $3,216.90 (making a total of $4,000) as compensation and reward, and this amount is to be divided among the owners, charterer, and crew of the Nordkyn in suitable proportions.

A decree may be drawn in conformity with this opinion.